Sullivan
No. 87-056
No. 87-144

REALCO EQUITIES, INC.

v.

JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY

March 10, 1988

346

*Feeney & Kraeger*, of Newport, and *Heller, Horowitz & Feit P.C.*, of New York, New York (*Thomas G. Kraeger, Stuart A. Blander* and *Eli Feit* on the brief, and *Mr. Feit* orally), for the plaintiff.

*Upton, Sanders & Smith*, of Concord (*Ernest T. Smith* on the brief and orally), for the defendant.

JOHNSON, J. The plaintiff, Realco Equities, Inc. (Realco), appeals the disposition of its claims in a real property dispute with the defendant, John Hancock Mutual Life Insurance Company (John Hancock). The Superior Court (*DiClerico*, J.) approved the Master's (*R. Peter Shapiro*, Esq.) report denying both Realco's request for specific performance of its real estate contract with John Hancock and its request for the return of its good faith deposit. For reasons stated below, we affirm the trial court's disposition of each of these requests. We decline to rule upon its decision requiring the plaintiff to post a bond pending appeal.

The relevant facts are briefly these. On June 6, 1985, after extensive negotiations, Realco executed an agreement with John Hancock to purchase land and buildings in Claremont known as the Claremont Mall Shopping Center. The agreement provided, *inter alia*, for a $5,125,000 purchase price, a $150,000 good faith deposit, which would also serve as liquidated damages, and a closing date within 90 days of the agreement, with time being of the essence.

From August through October 1985, Realco sought and obtained three written extensions of the agreed closing date. The first of these extended the closing from September 6 to October 10, the second from October 10 to October 21, and the third from October 21 to October 31. Each extension expressly stated that time was of the essence and that the grant of an extension would not constitute a waiver of this condition. In addition, the first extension increased the good faith deposit from $150,000 to $200,000. The second and third extensions each increased the purchase price by $25,000, making the total purchase price for the October 31 closing date $5,175,000. As an express condition for obtaining the first extension, Realco agreed that John Hancock had met all conditions precedent to closing.

On October 31, 1985, the plaintiff's attorney, Michael D. Passe, notified John Hancock that the plaintiff would be unable to close on that day because of a dispute between the first and second mortgagees who were financing the project. Although Attorney Passe had known of the dispute since late September, John Hancock had not previously been notified of the problem. When Realco was unable to resolve the mortgage dispute within the ten-day "window" that the contract provided for closing, John Hancock agreed, at Realco's request, to a fourth extension of the closing date from October 31 to December 5, 1985. This extension provided for a $100,000 increase in the purchase price and a $50,000 increase in the good faith deposit.

By letter dated November 15, 1985, Attorney Passe forwarded two fully executed originals of the fourth extension and a $50,000 check from Alfred S. Friedman (one of Realco's principals) to John Hancock's counsel. John Hancock received this letter on November 20, 1985. At this time, Attorney Passe telephoned to notify John Hancock that the letter had been sent by mistake and that Realco no longer desired the fourth extension. John Hancock then returned the executed fourth extension agreements and accompanying $50,000 check to Attorney Passe by letter of November 25, 1985. It also gave notice that it would retain Realco's $200,000 good faith deposit and accrued interest in accordance with the liquidated damages provision of the purchase and sale agreement.

From November 26, 1985, until March 17, 1986, there was no contact between the parties. Then, by letter of March 17, Eli Feit, Realco's attorney in this action, contacted John Hancock requesting that it return the $200,000 good faith deposit. Attorney Feit suggested in the alternative that Realco would complete the

transaction at a price of $5,175,000 if given time to obtain financing. John Hancock did not respond to this letter. When it received no response, Realco filed its petition in the present action in the superior court, asking for specific performance of its contract or the return of its good faith deposit. The case was heard before a master, who ruled against Realco on both issues. This appeal followed.

■■ On appeal we will uphold a master's findings and rulings, provided the record contains evidence sufficient to support them and they are not erroneous as a matter of law. *Johnson v. Korsak, Inc.*, 120 N.H. 412, 415–16, 415 A.2d 1141, 1143 (1980). "This court's appellate function is not independently to find facts in order to determine the appropriateness of an award of damages. 'Our only function is to determine whether a reasonable man could have reached the same decision as the master on the basis of the evidence before him.'" *Bower v. Davis & Symonds Lumber Co.*, 119 N.H. 605, 609, 406 A.2d 119, 122 (1979) (quoting *Sargent Lake Ass'n v. Dane*, 118 N.H. 720, 722, 393 A.2d 559, 561 (1978)).

## I. *Specific Performance*

Realco first argues that it is entitled to specific performance and that the master's findings on relevant points were in error. The master specifically found: (1) that time was of the essence of the parties' agreement; (2) that the failure to close on October 31 was the result of Realco's inability to obtain financing; (3) that this inability was the result of Realco's lack of due diligence and failure to obtain terms satisfactory to it; (4) that John Hancock was in no way responsible for the failure to close; and (5) that John Hancock did not breach the covenant of good faith and fair dealing implicit in the contract by requesting increases of the purchase price and good faith deposit as consideration for the fourth extension of the closing date.

■ The record amply supports these findings, and the master's decision to deny specific performance is entirely consistent with relevant law. We have repeatedly held that the trier of fact must decide whether time is of the essence of an agreement not by employing a mechanical test, but by determining "the intent of the parties in light of the instrument itself and all the surrounding circumstances, including the parties' words, actions, and interpretation of their agreement." *Allard & Geary, Inc. v. Faro*, 122 N.H.

573, 576, 448 A.2d 377, 379 (1982); *see Rogers v. Cardinal Realty, Inc.*, 115 N.H. 285, 286, 339 A.2d 23, 24–25 (1975).

Here the original contract and each extension explicitly made time of the essence. Each extension further stated: "[t]he agreement of Seller to Buyer's request for such extension shall not be deemed a waiver of such provision nor an agreement to any further extensions of the closing date." In addition, there was evidence in the record from which the master could have found that the parties specifically discussed the clause making time of the essence and that, after protesting for some time, Realco finally agreed to its inclusion in the contract. Furthermore, contrary to Realco's argument, John Hancock's requests for consideration in the form of increases in the contract price and good faith deposit, and its insistence that each extension include language making time of the essence, indicate the parties' intent that time remain of the essence. The fact that Realco never objected to the fact or amount of the increases only reinforces this conclusion.

■■ Given the fact that the master properly determined that time was of the essence of the agreement, Realco was entitled to specific performance only if responsibility for the parties' failure to close on the appointed date was attributable not to Realco but to John Hancock. 81 C.J.S. *Specific Performance* § 121(a) (1977). It is undisputed that failure to close was the result of Realco's inability to secure the anticipated financing. John Hancock was, at all relevant times, ready, willing, and able to perform. Furthermore, the record supports the master's finding that, although Realco knew that anticipated financing was uncertain, it made no attempt to secure alternative financing. It also supports the finding that Realco's principals were experienced real estate investors who not only could be expected to understand each term of the contract, but could also readily obtain alternative financing or monies necessary to close the deal. The record describes one principal, Philip Pilevsky, as a "major player" or "force" in the national real estate market, with real estate investments in excess of $100,000,000. There was evidence that lenders actually sought opportunities to finance his deals. Another principal, Alfred Friedman, was also an experienced investor with substantial holdings. The master found that "[f]or these sophisticated investors, the concern was not the problem of obtaining financing but the terms and conditions (*i.e.* rates) [at which] it would be made available to them."

■ The master's finding that John Hancock did not breach the contract's implied covenant of good faith and fair dealing similarly finds support in the record. A reasonable person could have found that increases in the purchase price, which aggregated three percent, and in the amount of the good faith deposit, were not extortionate demands meant to wring the last available penny from a desperate or unwitting buyer. Rather, they were reasonable requests for compensation in exchange for time extensions.

■ Since the contract between Realco and John Hancock made time of the essence, John Hancock was relieved of its duty to convey the property when, through the fault of Realco, the parties failed either to close on October 31 or to negotiate a further extension on reasonable terms. 81 C.J.S. *supra*.

## II. *Liquidated Damages*

The contract between Realco and John Hancock specifically provided that:

> "if title to said premises be found marketable, or be so made within said time, or if Buyer elects to waive such title defects and close the transaction contemplated by this Agreement, and Buyer shall fail to close such transaction in accordance with this Agreement, and continues in such default for a period of ten (10) business days, then, and in that case, Seller may terminate this Agreement, whereupon the sum of $150,000.00 [thereafter amended to $200,000.00] deposited under this Agreement and accrued interest thereon shall be retained by Seller as liquidated damages, whereupon all obligations of either party under this Agreement shall cease."

■■ We determine whether or not a party may retain the sum designated in what purports to be a liquidated damages clause by determining whether that amount is in fact liquidated damages, or is instead a penalty imposed upon one party for failure to perform. To distinguish liquidated damages from a penalty, we apply the following test:

> "A provision in a contract for the payment of a stipulated sum will be regarded and enforced in the event of its breach, as one for liquidated damages, when three conditions coexist, to wit: (1) that the damages to be anticipated as resulting from the breach are uncertain in

amount or difficult to prove; (2) that there was an intent on the part of the parties to liquidate them in advance; and (3) that the amount stipulated was a reasonable one, that is to say, not greatly disproportionate to the presumable loss or injury."

*Randall v. Riel*, 123 N.H. 757, 759, 465 A.2d 505, 507 (1983) (quoting *Langlois v. Maloney*, 95 N.H. 408, 412–13, 64 A.2d 697, 701 (1949)); *see also Bower*, 119 N.H. at 609, 406 A.2d at 122.

The record supports the master's finding that the clause in question provided for liquidated damages rather than a penalty. It is widely recognized that damages resulting from a failed real estate transaction are difficult to prove. *Bower supra*. In this case the usual difficulties in valuation were exacerbated by: (1) anticipated changes in the tax law which were expected to decrease both the pool of available buyers and the property's market value; (2) the property's remote location; and (3) the fact that the property was constantly subject to value fluctuations depending on the economic viability of its many tenants.

The record also supports the master's finding that the parties intended to liquidate damages in advance. The liquidated damages clause itself is clearly written, and there was evidence from which one could reasonably conclude that the parties, who were sophisticated real estate investors, intended it to have its obvious effect. Thus, it limited to $200,000 both the amount that John Hancock could recover on breach and the amount that Realco would pay, allowing the parties to avoid expensive and time-consuming litigation.

Finally, the master reasonably concluded that the many factors that might contribute to a loss in property value made the designated amount of damages, which was slightly less than 4% of the purchase price, a reasonable estimate of John Hancock's potential loss or injury. Contrary to Realco's claims, the evidence did not clearly demonstrate that John Hancock suffered no damage as a result of the agreement's failure. The very factors making value difficult to calculate at the time of contracting also made calculation difficult at the time of trial. Although there was testimony that the property had increased in value, there was also testimony that present value was impossible to determine with accuracy and that the amount of liquidated damages reasonably approximated possible losses.

In short, the evidence amply supports the conclusion that, in light of the difficulty of proving damages in the event of breach, parties sophisticated in the intricacies of profitable real estate investment agreed to liquidate damages in an amount reasonably approximating likely harm. When Realco failed either to obtain financing or to negotiate an extension on what it deemed profitable terms, it breached its agreement with John Hancock. Realco cannot now complain because, as a result of its own calculated business actions, it is required to adhere to the terms of its bargain.

### III. *Appeal Bond*

The master required that Realco either post a $260,000 bond pending appeal or provide the superior court with an irrevocable letter of credit equal to the balance due on the purchase price. RSA 525:3 and Superior Court Rule 163 respectively provide that a party may be required to post a bond reasonably reflecting either an opponent's taxable costs, or its potential damage due to injunction. The master did not base his order on either of these provisions. Instead, although no injunction issued against the defendant, he ordered the plaintiff to post a bond reflecting potential damage resulting from the defendant's effective inability freely to use or dispose of its property pending plaintiff's appeal.

Although it raised the issue, Realco admitted in its brief that "the question of an appeal bond will . . . be rendered moot upon this Court's disposition of the appeal . . . ." Similarly, John Hancock stated that "the issues raised by the defendant's 'Petition for Bond' have been rendered moot." Because neither party argued the issue orally and both agree that it is moot, we decline to rule upon the appropriateness of the master's order.

*Affirmed.*

All concurred.